UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WINDSTREAM SERVICES, LLC,

                          Plaintiff,

-against-

BMG RIGHTS MANAGEMENT (US) LLC and
RIGHTSCORP, INC.,

                          Defendants.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/17/17
```

16 Civ. 5015 (KMW) (RLE)

**MEMORANDUM**
**OPINION & ORDER**

KIMBA M. WOOD, District Judge:

      Plaintiff Windstream Services, LLC ("Windstream"), an internet service provider ("ISP"), brings this action against Defendants BMG Rights Management (US) LLC ("BMG"), a copyright holder, and Rightscorp Inc. ("Rightscorp"), BMG's copyright enforcement agent, seeking declaratory judgment regarding copyright noninfringement and damages for intentional interference with contractual relations. Defendants move to dismiss for lack of subject-matter jurisdiction and for failure to state a claim. For the reasons set forth below, the motion to dismiss is GRANTED.[1]

## I. BACKGROUND[2]

      Windstream provides internet access services to over one million subscribers nationwide. Am. Compl. ¶¶ 12-14, ECF No. 38. Windstream's subscribers pay a monthly subscription fee to receive unlimited internet access. *Id.* ¶ 16. Windstream provides a "pipeline" to the internet to its subscribers and does not monitor or control the actions taken by its subscribers or the content

---

[1] The Court notes that Windstream has requested oral argument. ECF No. 52. The Court finds the parties' submissions sufficiently helpful that oral argument is not necessary.

[2] The following facts are taken from the amended complaint and are assumed to be true for purposes of this motion to dismiss. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998) ("When considering a motion to dismiss . . . for failure to state a cause of action, a court must accept as true all material factual allegations in the complaint.").

transmitted over its network. *Id.* ¶ 26. Instead, Windstream merely transmits and routes the internet content requested by its subscribers. *Id.* ¶¶ 27-29.

As part of their subscriptions, Windstream's subscribers must agree to Windstream's Acceptable Use Policy ("AUP") and Terms and Conditions ("T&Cs") before using Windstream's internet services. *Id.* ¶ 17. As part of the AUP, Windstream's subscribers acknowledge that it is a violation of the AUP to use Windstream's internet services in any way that "infringes intellectual property." *Id.* ¶ 20. The AUP also provides copyright owners with instructions for filing a copyright infringement notice with Windstream and instructions for submitting counter-notifications in response to a wrongfully filed copyright infringement notice. *Id.* ¶ 23. Windstream reserves the right to terminate service "that it determines is excessive or unreasonable," *id.* ¶ 21, and may suspend or terminate accounts that violate the T&Cs, *id.* ¶ 22. The T&Cs state Windstream's ability to enforce copyright infringement policies and state that Windstream may limit, interrupt, suspend, terminate, or refuse internet services if a subscriber is using Windstream's services for unlawful activity. *Id.* ¶ 24.

BMG owns, administers, and licenses copyrights in musical compositions. *Id.* ¶ 33. BMG hired Rightscorp to detect and document potential infringement of BMG's coprights. *Id.* ¶¶ 34-36. In particular, Rightscorp has technology to monitor peer-to-peer filesharing systems such as BitTorrent. *Id.* ¶ 36. BitTorrent is a filesharing system that allows a user to "join a 'swarm' of hosts to upload or download content from one another simultaneously." *Id.* ¶ 37. When a user requests a file, the BitTorrent software "identifies multiple host computers with the identical file, simultaneously downloads small pieces of the requested file from each of these computers, and then reassembles the pieces into one file on the requesting computer." *Id.* Rightcorp's monitoring system "searches BitTorrent systems and extracts information attempting

to identify alleged infringers of BMG's copyrights." *Id.* ¶ 38. Using this information, Rightscorp, at BMG's direction, automatically generates copyright infringement notification letters that describe the potential infringement activity. *Id.* ¶ 39.

Since at least 2011, BMG, through Rightscorp, has sent and continues to send Windstream copyright notices describing instances of alleged infringement by Windstream's subscribers. *Id.* ¶ 41. The parties provided the Court with one representative notice. Allan Decl. Ex. 1 ("Sample Notice"), ECF No. 43-1; *see also* Miller Decl. Ex. A, ECF No. 51-1. The Sample Notice is an email that begins "Note to ISP: Please forward the entire notice." Sample Notice at 1. The Sample Notice is, from then on, addressed to the accused infringer, and begins:

> Your ISP has forwarded you this notice. Your ISP account has been used to download, upload or offer for upload copyright content in a manner that infringes on the rights of the copyright owner. Your ISP service could be suspended if this matter is not resolved. You could be liable for up to $150,000 per infringement in civil penalties.

*Id.* The Sample Notice describes the filename of the song that is allegedly covered by BMG's copyright, notes the time and date of the alleged infringement, states that BMG is the exclusive owners of copyrights for that musical artist, and identifies the computer of the accused infringer by its internet protocol ("I.P.") address. *Id.* The Sample Notice states that the "notice is an offer of settlement" and provides an internet link to Rightscorp's "automated settlement system," where the accused infringer can pay $30 per infringement to receive a legal release from BMG. *Id.* The Sample Notice describes that unauthorized copying or distribution constitutes copyright infringement and states that Rightscorp has a good-faith belief that the use complained of is not authorized by the copyright owner. *Id.* at 1-2. The Sample Notice is signed by Rightscorp's CEO. *Id.* at 2.

3

On April 1, 2016, counsel for BMG sent a letter to Windstream's general counsel regarding copyright infringement of BMG's copyrights on Windstream's network. Am. Compl. ¶ 51; *see also* Miller Decl. Ex. B ("April 1 Letter"), ECF No. 51-2. According to the April 1 Letter, Windstream had contacted Rightscorp in December "to discuss a solution to the ongoing infringement," and BMG responded to try to reach such a resolution. April 1 Letter at 1. The letter describes the notifications BMG and Rightscorp have provided to Windstream, including: the emailed notices; a dashboard that Rightscorp provided to Windstream "to view both historic and real time infringement of BMG's copyrighted works on its network"; and "summary letters, detailing the infringement of its copyrights on Windstream's network and requesting Windstream to take appropriate action." *Id.* Based on these mechanisms, BMG states that Windstream has knowledge of the infringement on its network, which includes millions of instances of infringement of thousands of copyrighted works. *Id.* The letter suggests that Windstream is allowing repeat infringers to use its network to continue to infringe BMG's copyrights even after Windstream was notified of specific instances of infringement and suggests that Windstream may be liable for actual or statutory damages. *Id.* at 2. The letter concludes by suggesting that "the parties begin an open dialogue to discuss an amicable resolution to this ongoing" infringement. *Id.*

On June 27, 2016, Windstream filed the instant lawsuit. Compl., ECF No. 1. In the amended complaint, Windstream brings suit on three counts: (1) declaratory judgment for noninfringement of copyrights; (2) declaratory judgment for statute of limitations; and (3) intentional inference with contractual relations under California law. Am. Compl. ¶¶ 59-79. As to the first count, Windstream seeks thirteen declarations from the Court:

4

(a) Windstream, as a mere conduit for the transmission of Internet services, is not directly liable under the Copyright Act for any alleged infringement of BMG's copyrights;

(b) Windstream, as a mere conduit for the transmission of Internet services, is not liable for contributory infringement of any of BMG's copyrights;

(c) Windstream, as a mere conduit for the transmission of Internet services, is not liable for vicarious infringement of any of BMG's copyrights;

(d) Windstream, as a mere conduit for the transmission of Internet services, is not liable for inducing infringement of any of BMG's copyrights;

(e) Windstream, as a mere conduit for the transmission of Internet services, is the type of ISP contemplated by 17 U.S.C. § 512(a) and is, therefore, not subject to the § 512(c) take-down notice provisions of the DMCA, including any Notices issued by Defendants;

(f) Windstream has not been and is not required to comply with or otherwise respond to Defendants' Notices;

(g) Even if Windstream were subject to the DMCA's take-down notice provisions, Defendants' Notices fail to comply with the DMCA's express statutory requirements for take-down notices as set forth in 17 U.S.C. § 512(c)(3) and are therefore insufficient to impose any legal duty on Windstream;

(h) Defendants' Notices do not provide Windstream with actual knowledge of any copyright infringement of BMG's copyrights by Windstream's subscribers;

(i) Defendants' Notices constitute misrepresentation of copyright infringement under 17 U.S.C. § 512(f);

(j) Defendants' Notices constitute intentional interference with contractual relations under California law;

(k) Windstream has never had actual knowledge of any copyright infringement of BMG's copyrights by Windstream's subscribers;

(l) Windstream has not acted willfully in violation of any provision of the Copyright Act or other laws; and

5

> (m) BMG is not entitled to any compensation or damages from Windstream for any alleged infringement of BMG's copyrights.

*Id.* ¶ 63.

## II. LEGAL STANDARDS

A.  <u>Rule 12(b)(1)</u>

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. . . . A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). In resolving a 12(b)(1) motion, "the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). "[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." *Id.* (quoting *APWU v. Potter,* 343 F.3d 619, 627 (2d Cir. 2003)).

B.  <u>Rule 12(b)(6)</u>

In order to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78 (2d Cir. 2015).

C.   Declaratory Judgment Act

The Declaratory Judgment Act ("DJA"), 28 U.S.C. § 2201, provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." *Id.* § 2201(a).

To qualify as "a case of actual controversy" under the DJA, the Supreme Court has "required that the dispute be 'definite and concrete, touching the legal relations of parties having adverse legal interests'; that it be 'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (alteration in original) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)). There must be "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

"*MedImmune* 'lowered the threshold' for establishing the existence of an actual case or controversy in intellectual property-related declaratory judgment cases." *Gelmart Indus., Inc. v. Eveready Battery Co.*, 120 F. Supp. 3d 327, 331 (S.D.N.Y. 2014) (quoting *AARP v. 200 Kelsey Assocs., LLC*, No. 06 Civ. 81, 2009 WL 47499, at *6 (S.D.N.Y. Jan. 8, 2009)). Previously, the test for "actual case or controversy" had two prongs: "(1) has the defendant's conduct created a real and reasonable apprehension of liability on the part of the plaintiff, and (2) has the plaintiff engaged in a course of conduct which has brought it into adversarial conflict with the defendant." *Starter Corp. v. Converse, Inc.*, 84 F.3d 592, 595 (2d Cir. 1996). In *MedImmune*, "the Supreme

7

Court found an actual controversy, even though plaintiff had complied with the defendants' demands by paying royalties under protest, had not infringed any of defendants' rights, and therefore had no reasonable fear of imminent suit." *AARP*, 2009 WL 47499, at *6 (citing *MedImmune*, 549 U.S. at 128, 137). Following *MedImmune*, "so long as '[t]he factual and legal dimensions of the dispute are well defined' and 'nothing about the dispute would render it unfit for judicial resolution,' jurisdiction is not defeated by a party's decision to refrain from taking some action and thus 'make[] what would otherwise be an imminent threat [of suit] at least remote, if not nonexistent.'" *Id.* (alterations in original) (quoting *MedImmune*, 549 U.S. at 128, 137). Nonetheless, the "threat of future litigation remains relevant in determining whether an actual controversy exists." *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 96 (2d Cir. 2011).

However, even when an actual controversy exists, the decision to hear a declaratory judgment action is discretionary. The Second Circuit has articulated five factors a court should consider before entertaining a declaratory judgment action:

> (i) "whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved"; (ii) "whether a judgment would finalize the controversy and offer relief from uncertainty"; (iii) "whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata'"; (iv) "whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court"; and (v) "whether there is a better or more effective remedy."

*N.Y. Times Co. v. Gonzales*, 459 F.3d 160, 167 (2d Cir. 2006) (quoting *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003)). If a court finds that either of the first two factors are satisfied, it must hear the declaratory judgment action. *See, e.g., Rolex Watch U.S.A., Inc. v. PRL USA Holdings, Inc.*, No. 12 Civ. 6006, 2015 WL 1909837, at *3 (S.D.N.Y. Apr. 27,

8

2015) (citing *Starter*, 84 F.3d at 597); *ACE Am. Ins. Co. v. Bank of the Ozarks*, No. 11 Civ. 3146, 2014 WL 4953566, at *19 (S.D.N.Y. Sept. 30, 2014) (quoting *Starter*, 84 F.3d at 597).

Finally, the Supreme Court has clarified that, at least in the patent context, the burden of proving infringement remains with the rightsholder. *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 849 (2014). The Court reasoned that, because the operation of the DJA is "only 'procedural'" and the burden of proof is a "'substantive' aspect of a claim," the burden of proof does not shift from the patentee to the licensee who brings a declaratory judgment action. *Id.* (first quoting *Aetna Life Ins. Co.*, 300 U.S. at 240; and then quoting *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 20-21 (2000)).

D.  Digital Millennium Copyright Act

The Digital Millennium Copyright Act ("DMCA") narrows the scope of liability that ISPs such as Windstream face for secondary liability for copyright infringement. The DMCA's safe-harbor provisions, "codified at 17 U.S.C. § 512[,] . . . protect qualifying Internet service providers from liability for certain claims of copyright infringement." *Capitol Records, LLC v. Vimeo, LLC*, 826 F.3d 78, 82 (2d Cir. 2016) (citing *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 27 (2d Cir. 2012)). Without the safe-harbor provisions, service providers could face secondary liability for copyright infringement if they "played a significant role in direct infringement committed by others, for example by providing direct infringers with a product that enables infringement." *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 422-23 (S.D.N.Y. 2011) (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 929-30 (2005); *Sony Corp. v. Universal City Studios*, 464 U.S. 417, 434-35 (1984)).

There are two safe-harbor provisions relevant to this dispute: the "transitory digital network communications" provision, 17 U.S.C § 512(a), and the "information residing on systems or networks at direction of users" provision, *id.* § 512(c).

The § 512(a) safe harbor provides that a "service provider shall not be liable . . . for infringement of copyright by reason of the provider's transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider, or by reason of the intermediate and transient storage of that material in the course of such transmitting, routing, or providing connections." *Id.* § 512(a). A "service provider" for purposes of § 512(a) is "an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received." *Id.* § 512(k)(1)(A). Generally, ISPs such as Windstream fit this definition. *See, e.g., Charter Commc'n., Inc. v. Subpoena Enforcement Matter*, 393 F.3d 771, 776 (8th Cir. 2005) (noting that the section "limits the liability of an ISP when it merely acts as a conduit for infringing material without storing, caching, or providing links to copyrighted material"). There are five conditions that must be met for a service provider to qualify for the § 512(a) safe harbor:

> (1) the transmission of the material was initiated by or at the direction of a person other than the service provider;
>
> (2) the transmission, routing, provision of connections, or storage is carried out through an automatic technical process without selection of the material by the service provider;
>
> (3) the service provider does not select the recipients of the material except as an automatic response to the request of another person;
>
> (4) no copy of the material made by the service provider in the course of such intermediate or transient storage is maintained on the system or network in a manner ordinarily accessible to anyone other than anticipated recipients, and no such copy is maintained on the system

10

> or network in a manner ordinarily accessible to such anticipated recipients for a longer period than is reasonably necessary for the transmission, routing, or provision of connections; and
>
> (5) the material is transmitted through the system or network without modification of its content.

*Id.* § 512(a)(1)-(5).

The § 512(c) safe harbor provides that a "service provider shall not be liable . . . for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." *Id.* § 512(a). The definition of "service provider" is broader under § 512(c), and includes "a provider of online services or network access, or the operator of facilities therefor." *Id.* § 512(k)(1)(B). To qualify for the § 512(c) safe harbor, the service provider must: (i) lack actual knowledge that the material on the system is infringing; (ii) not be aware of facts or circumstances that makes the infringing activity apparent; and (iii) if made aware of the infringing activity, act expeditiously to remove the material. *Id.* § 512(c)(1)(A).

Further, if the copyright holder provides the service provider with notification of alleged infringement, often called a DMCA take-down notice, the service provider must remove or disable access to that infringing material or activity. *Id.* § 512(c)(1)(C); *see also, e.g., Capitol Records, Inc. v. MP3tunes, LLC*, 611 F. Supp. 2d 342, 346 (S.D.N.Y. 2009). A DMCA take-down notice must: (i) be signed by a person authorized to act on behalf of the copyright holder; (ii) identify the copyrighted work allegedly infringed; (iii) identify the allegedly infringing material to be removed to permit the service provider to locate the material; (iv) include the complaining party's contact information; (v) contain a statement that the complaining party has a good-faith belief that the use of the copyrighted material is unlawful; and (vi) attest that the complaining party believes the information in the notice to be accurate, under penalty of perjury.

17 U.S.C. § 512(c)(3)(A).  A copyright holder can be liable to the service provider for materially misrepresenting that material or activity is infringing, if the service provider is injured as a result of relying on the notice to remove or disable access to material.  *Id.* § 512(f).

Finally, § 512(i) provides conditions for eligibility for all of the DMCA's safe-harbor provisions.  Under one such condition, a service provider will qualify for the safe-harbor protections only if it has "adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers."  *Id.* § 512(i)(1).

### III. DISCUSSION

The Court concludes that Windstream has not identified an actual case or controversy sufficient to give this Court jurisdiction.  Further, even if a case or controversy existed, the Court would exercise its discretionary power to decline to hear this declaratory judgment action.  Accordingly, the Court grants Defendant's motion to dismiss the declaratory judgment causes of action and declines to exercise supplemental jurisdiction over Windstream's state law claim.

A.   <u>Case of Actual Controversy</u>

In order to determine whether a case of actual controvery exists to establish subject-matter jurisdiction, the Court must consider whether "the adversity of legal interests that exists between the parties is 'real and substantial' and 'admi[ts] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'"  *Nike*, 663 F.3d at 95-96 (alteration in original) (quoting *MedImmune*, 549 U.S. at 127).  The amended complaint does not present such a controversy.  Instead, Windstream seeks a blanket approval of its business model, without reference to any specific copyright held by BMG or any specific act of direct infringement by any Windstream

subscriber. Windstream seeks the kind of hypothetical and advisory opinion, isolated from concrete facts, that cannot confer jurisdiction upon this Court.

The Southern District of California rejected a nearly identical lawsuit in *Veoh Networks, Inc. v. UMG Recordings, Inc.*, in which a video hosting service sued a music publisher seeking a declaratory judgment that their video hosting fell within the § 512(c) DMCA safe harbor. 522 F. Supp. 2d 1265, 1268 (S.D. Cal. 2007). The complaint "generally discusse[d] [Plaintiff's] video hosting operation, that Defendant owns unspecified copyrights, and that Defendant has made unspecified threats of copyright infringement litigation." *Id.* at 1269. And "[f]rom these general allegations, Plaintiff seeks a far-reaching declaratory judgment that it is not liable for infringing any of Defendant's rights and is entitled to the Section 512(c) safe harbor." *Id.* The court found that this complaint did not allege facts sufficient to establish an actual controversy:

> [B]ecause Plaintiff does not reference any specific copyright, even by way of example, the relief requested would necessarily take the form of an advisory opinion. Succinctly, the Court cannot determine whether a safe harbor for copyright infringement exists without knowing which rights are at stake. Rather than "specific relief through a decree of conclusive character," Plaintiff seeks a blanket validation of the ongoing legality of their business model. Divorced from a particular dispute over specific rights, Plaintiff's Prayer for Relief would have the Court declare a safe harbor as equally applicable against Defendant as to any other copyright holder. Such a declaration's effect on each one of Defendant UMG's copyrights would be uncertain enough; the effect on all other copyright holders not before the Court would be even more nebulous.

*Id.* at 1269-70.

Windstream's complaint presents the same problem: rather than seeking defined declarations of noninfringement regarding existing or foreseeable disputes about specific copyrights and instances of infringement, Windstream seeks broad declarations about every possible conflict that has occurred or could occur in the future. And Windstream seeks to obtain these declarations despite pleading that there is "no direct evidence that any Windstream

13

subscriber engaged in direct copyright infringement." Am. Compl. ¶ 55; *see also* Pl. Opp. 22, ECF No. 50 ("[T]here is no evidence of 'repeat infringers' (much less any actual infringers)."). The fact that Windstream simultaneously argues that there is an actual case or controversy and also that there is no evidence of copyright infringement highlights the hypothetical nature of Windstream's complaint.

Moreover, several of the declarations that Windstream seeks are not tethered to BMG's copyrights at all, but rather would apply to Windstream's potential liability to other entities under both the Copyright Act and other unspecified laws. *See, e.g.*, Am. Compl. ¶ 63(e) ("Windstream . . . [is] not subject to the § 512(c) take-down notice provisions of the DMCA, *including* any Notices issued by Defendants." (emphasis added)); *id.* ¶ 63(l) ("Windstream has not acted willfully in violation of any provision of the Copyright Act or other laws.").

The declarations Windstream seeks are dependent on a variety of specific factual determinations that simply cannot be made in broad strokes in a declaratory judgment. "Given the highly factual and time-sensitive findings required to satisfy Section 512(c), would today's declaratory relief essentially give Plaintiff a 'free pass' to infringe rights in the future? This question only highlights the fact that Plaintiff requests an advisory opinion, and not resolution of a current, specific dispute." *Veoh*, 522 F. Supp. 2d at 1270 n.3.

Windstream attempts to distinguish *Veoh* on two grounds. Both are unsuccessful. First, Windstream suggest that *Veoh* is no longer good law after *Medtronic*, arguing that "Defendants bear the burden to specifically identify the copyrights and alleged instances of infringement upon which their April 1, 2016 letter and notices of infringement are based, which Windstream may then rebut." Pl. Opp. 8. Windstream mischaracterizes *Medtronic*, which addressed only which party bears the substantive burden of proving infringement, and not the court's subject-matter

14

jurisdiction under the DJA. *See, e.g., Medtronic*, 134 S. Ct. at 847 (describing that Medtronic sought declaratory judgment that seven of its new products did not infringe two specific patents).

Second, Windstream argues that, unlike *Veoh*, defendants have "expressly and unqualifiedly accused Windstream of infringing their copyrights" and each notice Windstream received contained the name of the allegedly infringed copyrighted work. Pl. Opp. 8. The plaintiff in *Veoh*, like Windstream, alleged that the rightsholder accused it of "massively infringing" its copyrights and threatened litigation. *Veoh*, 522 F. Supp. 2d at 1268; *see also* Compl. ¶¶ 2-3, 61-67, *Veoh*, No. 07 Civ. 1568, ECF No. 1. And the fact that Windstream received notifications that its subscribers may have committed direct infringement does make its broad declaratory judgment complaint any more defined, as the complaint does not identify any actual instances of copyright infringement to define the case or controversy presently before this Court.

In another factually analogous case, *Pacific Bell Internet Services v. Recording Industry Association of America, Inc.*, an ISP sued copyright holders and their agent who provided copyright infringement monitoring services to obtain a declaration related to the notice letters the ISP received under § 512. No. 03 Civ. 3560, 2013 WL 22862662, at *1-4 (N.D. Cal Nov. 26, 2003). The court found that: "[T]he notice letters do not form the basis of an actual controversy. The notice letters do not threaten [the ISP] with litigation. [The copyright monitoring agent] does not bring copyright infringement actions on behalf of its clients, and [the copyright holder] has only alluded to the threat of litigation against [the ISP's] subscribers, not against [the ISP] itself." *Id.* at *4. Numerous other courts have found that no actual case or controversy exists in analogous circumstances. *See, e.g., Applera Corp. v. Mich. Diagnostics, LLC*, 594 F. Supp. 2d 150, 160 (D. Mass. 2009) (dismissing declaratory judgment counterclaim where patent holder

wrote a letter that, "with some palpable bravura, suggested a review of its entire patent portfolio, but it did not make any specific allegations of infringement" as to fifty-five patents); *Broadcom Corp. v. Qualcomm Inc.*, No. 08 Civ. 1829, 2009 WL 684835, at *6 (S.D. Cal. Mar. 12, 2009) (dismissing declaratory judgment action because plaintiff failed to "identify with any specificity" any of defendant's thousands of relevant patents and because plaintiff failed to specify any affirmative act by defendant); *cf. Fatwallet, Inc. v. Best Buy Enter. Servs., Inc.*, No. 03 Civ 50508, 2004 WL 793548, at *2 (N.D. Ill. Apr. 12, 2004) ("[P]laintiff cannot claim it suffered any injury or harm from the invocation of the notice provisions by defendant. It was free to ignore the notice and no harm would befall it that did not already exist irrespective of the DMCA.").

In sum, Windstream's declaratory judgment complaint seeks an advisory opinion that apprises Windstream on if or how it should respond to Defendants' notices and whether Windstream qualifies for DMCA's safe harbor provisions. As the Honorable Richard Posner has written:

> It would be very nice to be able to ask federal judges for legal advice—if I do thus and so, will I be subject to being sued and if I am sued am I likely to lose and have to pay money or even clapped in jail? But that would be advisory jurisdiction, which, . . . [is] inconsistent with Article III's limitation of federal jurisdiction to actual disputes . . . .

*Klinger v. Conan Doyle Estate, Ltd.*, 755 F.3d 496, 498-99 (7th Cir. 2014). Because Windstream seeks declarations untethered from any actual instances of copyright infringement or any mention of a specific copyrighted work, the complaint fails to identify an actual case or controversy and the declaratory judgment claims must be dismissed.

B.   The Court's Discretionary Powers

The DJA "has long been understood 'to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants.'" *MedImmune*, 549 U.S. at 136

(quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)). Even assuming that the Court had jurisdiction, applying the five factors set forth in *Dow Jones*, 346 F.3d at 359, the Court would exercise its discretion to dismiss the declaratory relief claims.

Turning to the first two factors, the Court finds that declaratory judgment would neither "serve a useful purpose in clarifying or settling the legal issues involved" nor "finalize the controversy and offer relief from uncertainty." *Dow Jones*, 346 F.3d at 359. The remedies Windstream seeks fail to settle any material dispute between the parties because the declarations Windstream seeks would not insulate it from future liability. Windstream's request for prospective relief is predicated on facts that cannot yet be established. As Windstream acknowledges, "nothing will prevent BMG from arguing that the facts regarding infringement and applicability of the DMCA's safe-harbor provision in future cases that materially differ from the facts in this case." Pl. Opp. 9. It is for this very reason that courts regularly reject the use of the declaratory judgment procedure to anticipatorily assert affirmative defenses, as Windstream seeks to do here. *See, e.g., John Wiley & Sons, Inc. v. Visuals Unlimited, Inc.*, No. 11 Civ. 5453, 2011 WL 5245192, at *7 (S.D.N.Y. Nov. 2, 2011) ("The anticipation of defenses is not ordinarily a proper use of the declaratory judgment procedure."); *Veoh*, 522 F. Supp. 2d at 1271 ("[N]umerous courts have refused to grant declaratory relief to a party who has come to court only to assert an anticipatory defense."); *cf. Velvet Underground v. Andy Warhol Found. for the Visual Arts, Inc.*, 890 F. Supp. 2d 398, 407 (S.D.N.Y. 2012) ("[T]he Declaratory Judgment Act cannot be used to test the validity of an affirmative defense that a plaintiff anticipates the defendant will assert."). A declaration from the Court today would not bar a lawsuit tomorrow. Further, some courts have held that declaratory judgment actions are not the proper vehicle to

address previously accrued harm.³ *See, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh v. Int'l Wire Grp., Inc.*, No. 02 Civ. 10338, 2003 WL 21277114, at *5 (S.D.N.Y. June 2, 2003)); *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 426 (S.D.N.Y. 2002). These two factors lean heavily against the exercise of jurisdiction. *See, e.g., Bruce Winston Gem Corp. v. Harry Winston, Inc.*, No. 09 Civ. 7352, 2010 WL 3629592, at *6 (S.D.N.Y. Sept. 16, 2010) (declining to exercise jurisdiction where relief sought was "too abstract to serve a useful purpose and is unlikely to end uncertainty and controversy between the parties").

The final three factors also weigh against entertaining Windstream's declaratory judgment action. Windstream's anticipatory filing is, in large part, merely being used for "procedural fencing." *Dow Jones*, 346 F.3d at 359. BMG's April 1 letter—written in response to Windstream's initial contact—states an interest to cooperatively resolving potential disputes between the parties without litigation. *Cf. Michael Miller Fabrics, LLC v. Studio Imports Ltd., Inc.*, No. 12 Civ. 3858, 2012 WL 2065294, at *2 (S.D.N.Y. June 7, 2012) ("[W]here a party is prepared to pursue a lawsuit, but first desires to attempt settlement discussions, that party should not be deprived of the first-filed rule's benefit simply because its adversary used the resulting delay in filing to proceed with the mirror image of the anticipated suit." (quoting *Ontel Prods., Inc. v. Project Strategies Corp.*, 899 F. Supp. 1144, 1150 (S.D.N.Y. 1995))); *Adirondack Cookie Co. Inc. v. Monaco Baking Co.*, 871 F. Supp. 2d 86, 94-95 (N.D.N.Y. 2012) ("As courts have repeatedly recognized, '[t]he anticipation of defenses is not ordinarily a proper use of the declaratory judgment procedure,' as '[i]t deprives the plaintiff of his traditional choice of forum and timing, and it provokes a disorderly race to the courthouse.'" (alterations in original) (quoting *Hanes Corp. v. Millard,* 531 F.2d 585, 592-93 (D.C. Cir. 1976))).

---

³ Windstream does not appear to dispute that a declaratory judgment pursuant to the DJA applies only prospectively. *See* Pl. Opp. 9 n.3.

The fourth factor—"whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court," *Dow Jones*, 346 F.3d at 359—is inapplicable.

Finally, the fifth factor—"whether there is a better or more effective remedy," *id.*—also counsels restraint. Windstream asks the Court to rule in broad strokes that it is immune from all liability under the Copyright Act. The fact intensive nature of this inquiry, divorced from the context of particular allegations of infringement, would be a burden on the parties and the Court and would implicate the rights of copyright holders not represented in this case. *See Veoh*, 522 F. Supp. 2d at 1271 ("Plaintiff's requested declaratory relief, given the vagaries of Plaintiff's Complaint, would seemingly insulate Plaintiff's business model against all infringement claims, from every copyright holder, for all time. Indeed, such a judgment would reach far beyond this particular case . . . .").

Therefore, even assuming that the Court had subject-matter jurisdiction to entertain Windstream's declaratory judgment claims, the Court would decline to do so.

C.   State Law Claim

Having dismissed Windstream's declaratory judgment claims, the Court declines to exercise supplemental jurisdiction over its California state law claim. *See* 28 U.S.C. § 1367(c) (district court may decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction"); *see also Klein & Co. Futures, Inc. v. Bd. of Trade of N.Y.*, 464 F.3d 255, 262 (2d Cir. 2006) ("[W]here . . . the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims."). Accordingly, Windstream's intentional interference with contractual relations claim is dismissed without prejudice.

## IV. CONCLUSION

For the reasons set forth above, Defendant's motion to dismiss is GRANTED. The Clerk of Court is directed to terminate the motion at ECF Nos. 34 and 41 and to close the case.

SO ORDERED.

Dated: April 17, 2017
      New York, New York

*/s/ Kimba M. Wood*
KIMBA M. WOOD
United States District Judge